#24584-a-JKM

**2008 SD 40**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CHAD CARPENTER,                                        Plaintiff and Appellant,

    v.

RAPID CITY RED DOGS, LLC,                      Defendant

    and

THE NATIONAL INDOOR FOOTBALL
LEAGUE,                                                          Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE THOMAS L. TRIMBLE
Judge

\* \* \* \*

MICHAEL J. SIMPSON of
Julius & Simpson, LLP                               Attorneys for plaintiff
Rapid City, South Dakota                           and appellant.

DENNIS W. FINCH of
Finch Bettmann Maks & Hogue, PC          Attorneys for defendant
Rapid City, South Dakota                           and appellee NIFL.

\* \* \* \*

ARGUED ON MARCH 27, 2008

OPINION FILED **06/04/08**

#24584

MEIERHENRY, Justice

[¶1.]        Chad Carpenter signed a contract to play indoor football for the Rapid City Red Dogs, a member of the National Indoor Football League (League).  While playing for the Red Dogs in a regular season league game, Carpenter suffered a wedge compression fracture in his neck.  The injury prevented Carpenter from working four weeks and cost him $5,461.95 in medical bills.

[¶2.]        At the time of Carpenter's injury, neither the Red Dogs nor the League was insured under the workers' compensation laws of South Dakota.  Carpenter sued both the Red Dogs and the League for workers' compensation benefits under SDCL 62-3-11.  The circuit court entered a default judgment against the Red Dogs, but granted the League's motion for summary judgment exempting it from liability for Carpenter's injuries.

[¶3.]        Carpenter appeals the circuit court's grant of summary judgment to the League.  The issue on appeal is whether the League is a joint employer with the Red Dogs and therefore equally responsible for workers' compensation coverage for Carpenter.

## DECISION

[¶4.]        As part of the summary judgment proceedings, the parties submitted a joint statement of undisputed facts.  Since there was no issue of material fact, the circuit court determined as a matter of law that only the Red Dogs, not the League, was obligated to provide workers' compensation coverage.  On appeal, we review the circuit court's application of the law de novo.  Thornton v. City of Rapid City, 2005 SD 15, ¶4, 692 NW2d 525, 528-29 (citations omitted).

-1-

[¶5.]     It is uncontested that Carpenter was employed by the Red Dogs and that the Red Dogs had no workers' compensation coverage for its employees. Carpenter claims that he was also an employee of the League.  He contends that the Red Dogs and the League were joint employers.  The circuit court rejected this contention.  It relied upon a provision in the employment contract that expressly designated that the Red Dogs would be responsible for workers' compensation coverage.  Carpenter claims the circuit court erroneously relied on the contract provision, because SDCL 62-3-18 unequivocally prohibits employers from contracting away their statutory obligation to provide workers' compensation insurance.

[¶6.]     We agree that the law does not allow a "contract or agreement, express or implied, . . . in any manner [to] operate to relieve any employer in whole or in part of any obligation created by [the workers' compensation statutes]."  SDCL 62-3-18.  Nevertheless, the circuit court did not err in granting the League summary judgment.  A de novo review of the entire contract along with the undisputed material facts supports the League's claim that Carpenter was not its employee.

[¶7.]     In order for a person to be entitled to workers' compensation benefits, an employer-employee relationship must exist.  Woodcock v. City of Lake Preston, 2005 SD 95, ¶10, 704 NW2d 32, 34; Egemo v. Flores, 470 NW2d 817 (SD 1991).  "[A]lthough the existence of an employer/employee relationship is normally a question of fact, where clear, the relationship may be determined by the court."  Goodman v. Sioux Steel Co., 475 NW2d 563, 565 (SD 1991).  Generally, we construe workers' compensation statutes liberally to find coverage.  Id.

[¶8.] South Dakota law defines an employer as: "[A]ny individual, firm, association, limited liability company, or corporation . . . *using the service of another for pay*." SDCL 62-1-2 (emphasis added). An employee is defined as: "[E]very person, including a minor, in the services of another under any *contract of employment*, express or implied . . . ." SDCL 62-1-3 (emphasis added). Although the statute requires service for pay, actual monetary payment is not required. Nevertheless, the employer must supply some form of "valuable consideration" to the employee for his/her services. *See* Schumacher v. Schumacher, 67 SD 46, 288 NW 796, 798 (1939) (stating that "'Pay' here means compensation, and whether respondent received his compensation for services in money or other valuable consideration is immaterial"). *See also Woodcock*, 2005 SD 95, ¶13, 704 NW2d at 35 (noting that gratuitous employees are not covered under the workers' compensation statutes).

[¶9.] The contract that Carpenter signed unequivocally provided that it was between Carpenter and the Red Dogs:

> THIS CONTRACT is between Chad Carpender (sic), hereafter "Player" and The Rapid City Red Dogs L.L.C., hereinafter "Club" as a member of the National Indoor Football League ("League"). In consideration of the promises made by each to the other, [Carpenter] and [the Red Dogs] agree as follows: . . . [the Red Dogs] employ [Carpenter] as a skilled football player. [Carpenter] accepts such employment. [Carpenter] agrees to provide his best effort and loyalty to [the Red Dogs]. . . . If the state in which [the Red Dogs] operates requires state Workman's Compensation Insurance, [the Red Dogs] will provide the coverage for [Carpenter].

Another contract provision specified that the Red Dogs would pay Carpenter "weekly for each League game the sum of weekly expense allowance and $200.00

per game while on active roster for the team." Clearly, compensation for regular season games derived exclusively from the Red Dogs.

[¶10.] Additionally, only the Red Dogs could terminate Carpenter's employment without cause.[1] The contract provided that:

> TERMINATION. The [Red Dogs] may terminate this contract without cause. If in the sole judgment of the [Red Dogs], [Carpenter's] service will not be necessary for [the Red Dogs] to field a professional football squad [the Red Dogs] may terminate [Carpenter's] contract. [Carpenter] understands that he is competing with other players for a position on the roster of said [Red Dogs]. At any time and in the sole judgment of the [Red Dogs], said [Red Dogs] may terminate this contract if [Red Dogs] determines that [Carpenter's] skill or performance has been unsatisfactory as compared with that of other players competing for roster positions, in which event all earned but unpaid salary [Carpenter] has earned or is otherwise entitled to shall be due and payable. . . .

[¶11.] In contrast, the contract does not specifically provide for Carpenter to receive any compensation from the League for his services.[2] Although Carpenter could be required to make publicity and promotional appearance "on behalf of official League or [the Red Dogs] corporate sponsors or suppliers, or the League and [the Red Dogs]," he was to "receive the appearance fee from [the] sponsor." The contract also called for Carpenter "to grant and assign" his name and/or likeness to

---

1. Although the League had the authority to terminate Carpenter's contract for player misconduct, this disciplinary authority demonstrates the League's role as a licensing/regulatory entity rather than Carpenter's employer.

2. The contract provision entitled EMPLOYMENT AND SERVICES includes the following:
   > If invited, [Carpenter] will practice for and play in any and all all-star football games sponsored by the League. [Carpenter] will receive compensation if playing in All-Star game.

   The terms of the contract do not specify whether the compensation for the all-star games is paid to Carpenter by the Red Dogs or the League.

the "League, [the Red Dogs] and any League-designated entity" for "advertisement, promotion or sale of trading cards or any other commercial product or entity." He was required to waive any claim to revenues except he could "receive compensation for playing cards, still photographs, motion pictures and videos." Even if we were to assume that the League would have compensated Carpenter - either directly or through the Red Dogs - had he been chosen to participate in the all-star games, all of his compensation for regular season games unquestionably came from the Red Dogs. Since Carpenter was injured during a regular season game, the Red Dogs, not the League, was paying Carpenter for his service. Thus, the League does not meet the definition of employer under SDCL 62-1-2 because the League was not "using the service of [Carpenter] for pay."

[¶12.]     Carpenter cites *Gulbrandson v. Town of Midland* as authority for his joint employment argument. 72 SD 461, 36 NW2d 655 (1949). Contrary to his position, the right to seek payment was central to finding joint employment in *Gulbrandson. Id.* at 657 (requiring an employment contract agreeing to service for pay). In *Gulbrandson,* Charles Schofield, the acting town marshal, also served in the capacity as deputy sheriff for the county. Schofield sought Gulbrandson's help in apprehending robbers. While under Schofield's direction, the robbers shot and killed Gulbrandson. Gulbrandson's family sued both the town and the county for benefits related to his death. We determined that Gulbrandson was under the direction of both the town and the county and could have been compensated for services from either entity. *Id.* at 658.

[¶13.]     Carpenter contends that because of the League's control over the game, the Red Dogs and the players; the League had an express and/or implied contract of employment with Carpenter.  Carpenter relies on certain league regulations and contract provisions in support of his express and implied contract argument.[3]

[¶14.]     Even recognizing that the League had the authority to regulate and control certain aspects of Carpenter's services in regular season games and that it benefited from Carpenter's performance, Carpenter had no right to seek payment from the League and the League had no obligation to pay for or to provide other valuable consideration for Carpenter's services in regular season games.  Consequently, the League was not a joint employer of Carpenter for purposes of workers' compensation coverage.

[¶15.]     Affirmed.

---

3.     Carpenter cites to the following league regulations and contract provisions: The contract was printed on League letterhead, with three lines designated for signatures of the player, team representative and the CEO of the League (only the team representative and Carpenter actually signed the contract); the League was the sole arbiter of disputes between the Red Dogs and Carpenter; the League mandated certain apparel (but did not supply the apparel); incentive based contracts between the player and club required the League's approval; the League set the rules and regulations for league games; both the League and the Red Dogs were empowered to release players from their contract in order to sign with another professional football league; the League was permitted to use the player's name and likeness and pictures for publicity and promotion of the League, the Red Dogs or any of its other member clubs; both the League and the Red Dogs were empowered to direct the player to make personal appearances on behalf of the League or the Red Dogs corporate sponsors or suppliers; the League was permitted to use the players name and/or likeness in connection with advertising, promotion or sale of trading cards or any other commercial product or entity; and the League could fine, discipline or terminate player's contract for misconduct such as betting on league games, drug use, etc.

#24584

[¶16.]     GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.